## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SHAVONDA BROOKS, on behalf of minor child A.B., <br><br> Plaintiff, <br><br> v. <br><br> BRIAN KAHRS, CHERIE' W. BLANCHARD, JOSEPH P. LOPINTO III, <br><br> Defendants. | Civil Action No. 21-2280 <br><br> Judge: <br><br> Magistrate Judge: |

### COMPLAINT AND JURY DEMAND

Plaintiff, Shavonda Brooks, on behalf of minor child A.B., brings this action against Brian Kahrs, Cherie' W. Blanchard, and Joseph P. Lopinto III, and alleges as follows:

**I.**     **INTRODUCTION**

1.      This is a civil action seeking damages against Defendant Officer Brian Kahrs of the Jefferson Parish Sheriff's Office ("JPSO") and the leader of that Office, Defendant Sheriff Joseph P. Lopinto III. Defendant Kahrs beat up and arrested, at gunpoint, a 16-year-old African-American boy (named "A.B."). A.B. had done nothing other than, together with his cousin, sell brownies in a parking lot in hopes that the two of them could save up enough money to buy a video game.

2.      Defendant Kahrs' conduct on December 14, 2020 reflects a type of racialized policing that has fermented in Jefferson Parish for decades and that Defendant Lopinto has allowed to continue. Unfortunately, A.B. was not the first victim; nor will he be the last.  Indeed, it is this very type of racialized policing that led to the viral video beating of Shantel Arnold near her own

home;[1] the victim who went into diabetic shock, only to have officers restrain her as she nearly died from fatally low blood sugar levels;[2] and the deaths of 12 men and boys following an arrest or pursuit by JPSO.[3]

3.     A.B. is another in a long line of young black victims of police violence who, as mere teenagers and without provocation, are treated by the police as if they are malevolent and dangerous.[4] Indeed, even though black children make up only 13% of youth in America, they represent more than a third of all emergency room visits for injuries at the hands of police and security guards.[5] Such mistreatment exacerbates existing issues of systemic racism in policing.[6] Sadly, young teens that experience racism—such as violence at the hands of police at a young and

---

[1] Richard A. Webster, *Three Children Attacked a Black Woman. A Sheriff's Deputy Arrived—and Beat her More,* WWNO, Oct. 16, 2021, https://www.wwno.org/news/2021-10-16/three-children-attacked-a-black-woman-a-sheriffs-deputy-arrived-and-beat-her-more.

[2] Richard A. Webster, *They Saw Me and Thought the Worst*, WWNO, Sep. 24, 2021, https://www.wwno.org/news/2021-09-24/they-saw-me-and-thought-the-worst.

[3] Lisa Riordan Sevilly and Hannah Rappleye, *A sheriff's deputy shot a 14-year-old boy. It went unreported for months*, NBC News, Jul. 16, 2020, https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

[4] Phillip Atiba Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J. of Personality and Soc. Psychol. 526, 529-30 (2014); Eva Paterson, Luke Edwards, *Implicit Injustice: Using Social Science to Combat Racism in the United States*, 2015 Harv. J. Racial & Ethnic Just. Online 1, 18 (2015); *see also* Abbie Vansicle & Weihua Li, *Police Hurt Thousands of Teens Every Year. A Striking Number Are Black Girls,* The Marshall Project, Nov. 2, 2020, https://www.themarshallproject.org/2021/11/02/police-hurt-thousands-of-teens-every-year-a-striking-number-are-black-girls (describing how adults see young black girls as "older and less innocent" than white girls of the same age).

[5] *See* Vansicle & Li, *supra* n.4.

[6] *See, e.g.*, Frank Edwards, et al., *Risk of being killed by police use of force in the United States by age, race – ethnicity, and sex*, 116 PNAS 16793, 16794 (2019) (finding that Black men are 2.5 more likely than white men to be killed by law enforcement); Mark Hoekstra & Carly Will Sloan, *Does Race Matter for Police Use of Force? Evidence from 911 Calls*, NBER, Feb. 2020, https://www.nber.org/papers/w26774; Oliver Laughland, *US police have a history of violence against black people. Will it ever stop?*, The Guardian, Jun. 4, 2020, https://www.theguardian.com/us-news/2020/jun/04/american-police-violence-against-black-people.

influential age—often suffer long-term detrimental effects, including both psychological harm and such physical symptoms as elevated blood pressure and stress hormones.[7]

4.      On the day in question, A.B. was selling brownies with his cousin, T.B., in the parking lot of a Brother's Food Mart, which is part of a gas station. The attendant of the Brother's Food Mart phoned police to complain about two "juveniles" selling items in front of the store. When Defendant Kahrs arrived minutes later, A.B. and T.B. had already left the premises. Defendant Kahrs spoke to the attendant. He then left the store after observing two boys who met the description given by the attendant (A.B. and T.B.) crossing a nearby street.

5.      Defendant Kahrs got into his car and drove toward A.B. When he got close to A.B., he stopped, got out of the car, and immediately drew his gun.  He proceeded to point the gun at A.B., who immediately stopped cold and raised his hands. Despite A.B.'s immediate submission, Defendant Kahrs quickly threw A.B. onto the hood of his car and then to the ground, repeatedly punching him before handcuffing him and bringing him to jail. A.B. suffered a cut and multiple bruises as well as severe pain in his wrist. A.B. was treated at the Children's Hospital of New Orleans that evening; he was diagnosed with a fractured wrist. The next day, suffering from continued wrist pain due to his injuries from the encounter with Defendant Kahrs, he received a cast on his arm and wrist.

6.      A.B. continues to experience emotional and psychological harm as a result of the assault, including increased anxiety, sleeplessness, nightmares, and a fear of law enforcement.

7.      After the assault, the undersigned counsel attempted repeatedly to obtain related public records, such as video footage from officers' dash cameras. JPSO, through its record

---

[7] *See* David Williams et al., *Racism and Health: Evidence and Needed Research,* 40 Ann. R. Pub. Health 105, 112 (2019); *see also supra* n. 4.

3

custodian Defendant Cherie' Blanchard, repeatedly and summarily denied these requests on changing grounds and without justification, in violation of Louisiana public records law.

## II.   PARTIES

8.     Plaintiff Shavonda Brooks is a person of majority and a resident of Metairie, Louisiana.

9.     A.B. is the 17-year-old minor child of Shavonda Brooks.

10.     Defendant Officer Brian Kahrs, at the time of the events set forth in this complaint, was employed as an officer of JPSO. He is sued in his individual capacity. On information and belief, Defendant Kahrs is a resident of Louisiana.

11.     Defendant Cherie' W. Blanchard in her official capacity as records custodian for JSPO, is, upon information and belief, a citizen within this Court's jurisdiction.

12.     Defendant Joseph P. Lopinto III is the Sheriff of JPSO and is the principal and final policymaker of JPSO, responsible for hiring, firing, training, supervising, and establishing the policies, procedures, customs, and practices governing Defendant Kahrs' conduct while on duty. Defendant Lopinto and JSPO at all times relevant hereto employed Defendant Kahr. Defendant Lopinto was, at all relevant times herein, the Sheriff of JPSO acting and/or neglecting to act in the course and scope of his employment and under color of state law. He is sued in his official capacity.

## III.   JURISDICTION AND VENUE

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) because Plaintiff's claims of federal civil rights violations arise under the Constitution and laws of the United States, including 28 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue in the Eastern District of Louisiana is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in Jefferson Parish, Louisiana, which is located within the Eastern District of Louisiana.

15.     Declaratory relief is authorized by 28 U.S.C. § 2201. A declaration of law is necessary to determine the respective rights and duties of the parties.

## IV.     FACTUAL ALLEGATIONS

### *JPSO Has a Deep-Rooted History of Racist Policing and Unlawful Conduct*

16.     The abuse that A.B. endured at the hands of JPSO is a continuation of a history and pattern of intentional discriminatory treatment that he and many people from the Black community in Jefferson Parish are forced to confront.

17.     Between 2013-2020, though Black people were only 26% of the Parish population, they made up 73% of the people killed by the police.[8] This racial disparity in deadly force by JPSO is worse than 95% of other police departments nationwide.[9]

18.     Unsurprisingly, given these deeply disturbing statistics, "[t]he Black community . . . fear[s] the Jefferson Parish Sheriff's Office."[10] That fear is justified because the Sheriff's Office has immense power.[11] Harry Lee, who served as the Jefferson Parish Sheriff for nearly three

---

[8] Police Scorecard, *Jefferson Parish Sheriff's Department* (2020), https://policescorecard.org/la/sheriff/jefferson-parish. (The Police Scorecard, built by Samuel Sinyangwe and a team of data scientists, designers, developers, organizers, and students, is a nationwide public evaluation of policing in the United States. The Scorecard calculates levels of police violence, accountability, racial bias, and other policing outcomes for over 16,000 municipal and county law enforcement agencies).

[9] *Id.*

[10] John Simerman, Michelle Hunter & Ramon Antonio Vargas, *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force*, The New Orleans Advocate, Jun. 27, 2020, https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

[11] Lisa Riordan Sevilly and Hannah Rappleye, *A sheriff's deputy shot a 14-year-old boy. It went unreported for months*, NBC News, Jul. 16, 2020, https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

decades (until 2007), stated that "[t]he sheriff of [Jefferson Parish]is the closest thing there is to being a king in the U.S."[12]

19.     Harry Lee used his immense power to weave overtly anti-black policing tactics into JPSO policy, which still pervades JPSO today. After Hurricane Katrina caused a spike in crime in Jefferson Parish, Lee stated, "[w]e know where the problem areas are. If we see some black guys on the corner milling around, we would confront them."[13] At a time when robberies broke out in the Parish, with people being targeted in their driveways, Lee "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[14] On another occasion, while addressing crime in the Parish, Lee told a reporter that "[w]e know the crime is in the black community. Why should I waste time in the white community?"[15] In 2006, Lee stated in connection with a new plan to combat crime in the Parish: "We're only stopping black people."[16] In sum, "[JPSO] deputies follow starkly different rules—over stops, chases, use of force and the disciplinary process."[17]

20.     Lee and his racist policing were popular among those who actively cast a ballot in his election. He was re-elected seven times during his nearly thirty-year reign, by the same community that elected Ku Klux Klan leader David Duke to be a state representative in 1989. That

---

[12] John Burnett, *Larger-Than-Life Sheriff Rules Louisiana Parish*, NPR, Nov. 28, 2006, https://www.npr.org/templates/story/story.php?storyId=6549329.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Adam Nossiter, Harry Lee*, Outspoken Louisiana Sheriff, Dies at 75*, The New York Times, Oct. 2, 2007, https://www.nytimes.com/2007/10/02/us/02lee.html.

[17] John Simerman, Michelle Hunter & Ramon Antonio Vargas, Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force, The New Orleans Advocate, Jun. 27, 2020, https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

community went on to elect Lee's hand-picked successors: Newell Normand (with 90% of the vote) and Joseph Lopinto, III, the current JPSO sheriff.[18]

21.     Lee's policies and his monarchical above-the-law mentality continued under Normand's reign, and continues under Lopinto's as well.

22.     Eric Harris. Keeven Robinson. Chris Joseph. Daviri Robertson. Leo Brooks. Modesto Reyes. Tre'Mall McGee. These are just some of the Black or Latino men and boys who have been shot by JPSO in recent years in questionable circumstances. Of that group, only McGee survived. McGee was just 14 years old when JPSO officers shot him in an incident concealed from the public for three months.[19]

23.     JPSO's king-like impunity appears to stem from the active steps it takes to hide its misconduct. Even though over half of Louisiana sheriffs and nearly all large police forces in the state have been using body cams for years, Lopinto only recently, in late 2021, decided to implement their use—though without any clear guidelines as to exactly who will be outfitted and

---

[18] Michelle Hunter, *Jefferson Parish Sheriff Newell Normand says he's 'going out on top,'* The Times-Picayune, Jul. 26, 2017, https://www.nola.com/news/crime_police/article_d2bc031d-617f-52ea-85fb-df44d0039826.html; *Advocate staff report, Learn more about Joe Lopinto -- Newell Normand's successor as Jefferson Parish sheriff*, The New Orleans Advocate, Jul. 25, 2017, https://www.nola.com/article_596c4bd3-cb80-5e1f-bbf5-9b62b1ded48f.html.

[19] Lisa Riordan Sevilly and Hannah Rappleye, *A sheriff's deputy shot a 14-year-old boy. It went unreported for months*, NBC News, Jul. 16, 2020, https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

rules for operation.[20] Lopinto had previously cited budget concerns,[21] all the while disregarding the loss of life,[22] when strenuously opposing this added measure of transparency.

24.     Significantly, it is not only the lack of video evidence that plagues JPSO's victims. It is also the lack of documentary evidence. In fact, when requestors seek public records about JPSO's use-of-force and complaints about use of force, the Sheriff's Office stonewalls, often claiming the records do not exist and that it would violate privacy rights should they be disclosed.[23] And in other instances, the records that JPSO does keep fail to accurately record race and ethnicity data, making it impossible to identify JPSO's disparate treatment.[24]

25.     Moreover, JPSO refuses to share information about its internal investigations into alleged JPSO misconduct (if they even occur), further instilling fear in the communities of color with whom JPSO interacts.[25]

---

[20] *Our Views: Jefferson Parish Sheriff Makes Wise Decision to Deploy Body Cameras*, The Advocate, Oct. 20, 2021 https://www.theadvocate.com/baton_rouge/opinion/our_views/article_cacbd5a6-30d8-11ec-94dc-077995610168.html; *Jefferson Parish Sheriff Announces Body Cameras Coming*, Associated Press, Oct. 15, 2021 https://apnews.com/article/technology-louisiana-new-orleans-b746934ac127b77a12dd8e43540f9699

[21] Jefferson Budget FY15 to 19, https://www.incarcerationtransparency.org/wp-content/uploads/2021/05/Jefferson-Budget-FY15-to-19.pdf; FY2019-2020 Amended-FY2020-2021 Proposed Budget Book-Final, https://jpso.com/DocumentCenter/View/937/Current-Budget.

[22] John Simerman, Michelle Hunter, and Ramon Antonio Vargas, *Jefferson Parish Sheriff's Office an outlier on body cams as criticism swirls around deadly force*, The Times-Picayune / The New Orleans Advocate, Jun. 27, 2020, https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

[23] Southern Poverty Law Center, *Demanding Accountability: SPLC Sues La. Sheriff's Office for Public Records Regarding Officer Brutality*, 2021, https://www.splcenter.org/news/2021/04/16/demanding-accountability-splc-sues-la-sheriffs-officepublic-records-regarding-officer. (The request sought data on officer-involved injuries and internal affairs records regarding citizens' complaints made against officers from 2010 to 2020.)

[24] Richard A. Webster, "*If Everybody's White, There Can't Be Any Racial Bias": The Disappearance of Hispanic Drivers from Traffic Records*, ProPublica Nov. 22, 2021, https://www.propublica.org/article/if-everybodys-white-there-cant-be-any-racial-bias-the-disappearance-of-hispanic-drivers-from-traffic-records

[25] Lisa Riordan Sevilly and Hannah Rappleye, A sheriff's deputy shot a 14-year-old boy. It went unreported for months, NBC News, Jul. 16, 2020, https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

26.      It is this backdrop that A.B. and T.B. woke up to on the morning of December 14, 2020. The fact that they were simply two young men with no prior criminal records did not matter nearly as much as the color of their skin.

***The Events Leading to JPSO's Arrival: A.B. and His Cousin Sell Brownies to Save Up for a Video Game***

27.      At or around noon on December 14, 2020, A.B. and T.B. were selling homemade brownies in the parking lot of a Brother's Food Mart, a convenience store located at 6600 Veterans Boulevard in Metairie, Louisiana (the "Store"). The boys were selling the brownies out of a big plastic bowl to raise funds to buy themselves a PlayStation video game that they could play together.

28.      At around 11:50 a.m., a store attendant asked the boys to leave. The boys only had one brownie left to sell and a patron who had just entered the store indicated he would buy it from them after he left the store. So the boys relocated to the sidewalk east of the store.



(The Store is the southern building at the bottom of the above photo.
The structure to its north is a gas station)

29.     Shortly after the attendant asked the boys to leave, Defendant Kahrs responded to

a report of two "juveniles" selling items in front of the Store. Defendant Kahrs arrived within a

few minutes of the call (no later than 12 noon). He purportedly spoke with the attendant who had called the police about the boys selling brownies.

30.     By the time Defendant Kahrs arrived, the boys were already leaving the vicinity of the Store. Because the boys had first relocated to the sidewalk and then left the vicinity of the store altogether after being asked to leave, they had committed no crime and there was no probable cause to arrest them.

31.     After leaving the Store, the boys walked north to cross Veterans Memorial Boulevard, with A.B. holding the large plastic bowl. On the other side of Veterans Memorial Boulevard was a large, fenced-in strip mall with several shops. Below is a satellite image of the parking lot (with North being the top of the image).



(After leaving the Store, the Boys crossed Veterans Memorial Boulevard, the street running left to right at the bottom of the image. They then made their way north, across the parking lot and toward the top of the image. Defendant Kahrs followed, arrested, and assaulted A.B. at the location circled at the top of the image, behind the Vitamin Store Building.)

***Defendant Kahr Pursues the Boys in His Police Vehicle***

32.     After meeting briefly with the attendant, Defendant Kahrs left the Store and saw

the boys walking across the street. He got in his car to follow, driving into the parking lot.



34.     Defendant Kahrs followed A.B. around the Vitamin Store Building, which was 1/5

of mile from the Store parking lot. When A.B. turned the corner of the Vitamin Store Building,

Defendant Kahrs had still not asked him to stop in any way.

***Defendant Kahrs Gets Out of His Car and Proceeds to Use Unjustified and Unconstitutional
Excessive Force Against A.B.***

35.     Evidently, after A.B. turned the corner of the Vitamin Store Building and was out

of apparent view of potential witnesses, Defendant Kahrs decided he would violently arrest A.B.

at gunpoint with no prior warnings and no probable cause to do so.

13

36.     After turning the corner of the Vitamin Store Building, Defendant Kahrs exited his marked police car and yelled at A.B. to stop.

37.     A.B. turned, and seeing that Defendant Kahrs had his gun trained on him, A.B. immediately stopped and put up his hands—still holding the plastic bowl—to comply.

38.     A.B. completely surrendered to Defendant Kahrs.

39.     Defendant Kahrs had no reason to draw his gun on A.B. The complainant who had called about A.B.'s mere alleged trespassing—at most a Class B misdemeanor—never stated or indicated that either boy was armed. And indeed, A.B. was not, as a later search of his pockets during the arrest showed.

40.     A.B., a boy holding a plastic bowl, posed no threat to Defendant Kahrs or anyone else. A.B. was also not fleeing—Defendant Kahrs had not yet even asked A.B. to stop when he drew his gun on him.

41.     As Defendant Kahrs approached, A.B. asked why he was being arrested, but he received no response.

42.     Ignoring A.B.'s peaceful surrender and refusing to answer the boy's question, Defendant Kahrs violently grabbed A.B. by the sweatshirt and threw him on the hood of the police car.

43.     A.B. submitted to the violence without resisting arrest.

44.     Defendant Kahrs had no reason to throw A.B. on the hood of his car. A.B. had immediately stopped the first time when (inappropriately, with a handgun) Defendant Kahrs asked him to and was complying with his arrest.

45.     After forcing A.B. on the hood of the car, Defendant Kahrs repeatedly punched A.B. in the face, at least five times. A.B. continued not to react and remained compliant. It was

also at approximately this point that Defendant Kahrs searched A.B.'s pockets, and found no weapons. He did find A.B.'s cellphone, which he quickly threw away from the two of them.

46.     Defendant Kahrs had no reason to repeatedly punch A.B. Secured on the hood of Defendant Kahrs' police car, A.B. remained complaint.

47.     After punching A.B. repeatedly, Defendant Kahrs shoved A.B. to the ground and onto his stomach, further incapacitating A.B.

48.     Defendant Kahrs had no reason to shove A.B. to the ground.

49.     Defendant Kahrs proceeded to punch A.B. while he was on the ground, at least three times.

50.     Next, Defendant Kahrs got on top of A.B.'s back, putting his weight on A.B. to the point of choking him as he handcuffed him. A.B. never resisted.

51.     Defendant Kahrs had no reason to put all his weight on A.B. to the point of choking him.

### T.B. Finds Defendant and A.B. and Immediately Seeks Help

52.     Minutes after Defendant Kahrs turned the corner behind the Vitamin Store Building, T.B. walked toward the back of Vitamin Store Building to see what had happened. He saw A.B., having just been handcuffed, on the ground with his mouth bleeding. Upon seeing T.B., A.B. yelled in distress that Defendant Kahrs had "beat" him.

53.     Fearing what might further happen to A.B., T.B. ran back to the front of the Vitamin Store Building and found some patrons in the parking lot. He asked a woman to call *more* police. He then borrowed a man's phone to call Shavonda Brooks at 12:09 p.m. to notify her of what had happened to A.B. Ms. Brooks did not pick up because she was at work.

***JPSO Arrests T.B. At Gunpoint***

54.     At some point during Defendant Kahrs' pursuit of the boys, he radioed other officers for support. One of the responding officers was Randolph McClendon. (McClendon recently resigned from the JPSO to avoid discipline for unlawfully attempting to evict a pregnant resident.[26] This was the second time he had resigned to avoid discipline.[27])

55.     Upon his arriving at the parking lot, McClendon identified T.B. by the description provided by Defendant Kahrs. McClendon then arrested T.B. at gunpoint.

56.     McClendon placed T.B. in the back of Defendant Kahrs' vehicle with A.B. and proceeded to bind T.B.'s legs together.

***Shavonda Brooks Retrieves the Boys from JPSO***

57.     About an hour later, after seeing the missed call from an unknown number, Ms. Brooks called that number back. A man picked up the phone. He explained that a young man asked to use his phone before being arrested.

58.     Ms. Brooks was unable to reach anyone via phone when she called JPSO about the incident. Accordingly, she went to the station to try and find the boys. After arriving at 3 p.m., she was made to wait until 5 p.m. before she was able to see the boys and bring them home.

59.     Defendant Kahrs' violent abuse of A.B. left him with cuts, bruising, and swelling to his face and arm. A.B. received no meaningful treatment by medical personnel responding to the scene, or apparently, at JPSO's facility after being arrested.

---

[26] John Simeran, *Jefferson Parish Sheriff's Deputy Resigns Over Eviction Attempt in Uniform*, The New Orleans Advocate, May 7, 2021, https://www.nola.com/news/article_9f260baa-aebb-11eb-a3c8-f3cba6133811.html

[27] *Id.*

60.     It was Ms. Brooks who took her son to the hospital after the incident. At the hospital, the orthopedic surgeon confirmed one fracture in A.B.'s wrist and identified a second possible fracture. A.B. received a sling that night and had to return the next day to receive a cast and splint for his fractured wrist.

61.     What began with two boys selling homemade brownies ended with one boy in the hospital with a fractured wrist. At no time had A.B. resisted arrest or presented any physical threat that possibly could have necessitated this violent treatment at the hands of Defendant Kahrs.

62.     After hearing about the incident from the boys and seeing the extent of the injuries at the hospital, Ms. Brooks was left shocked by the conduct of Defendant Kahrs. She filed an internal affairs report two days after the incident. Nearly a year later, she has yet to hear back about the outcome of any investigation.

***JPSO Hides Details about the Incident***

63.     Since the assault, the undersigned counsel have tried to obtain information about what occurred on December 14, 2020, through repeated public records requests to JPSO under the Public Records Act of Louisiana, R.S. 44:1 *et seq*. JPSO has repeatedly rebuffed these requests based on shifting excuses.

64.     Counsel began their efforts by mailing a request under the Public Records Act of Louisiana to JPSO on May 13, 2021. Among other items, they requested the following information regarding Defendant Kahrs' assault on A.B. and those involved:

      a.   "body, backseat, and dash-camera recordings or footage"

      b.   police reports;

      c.   internal affairs complaints and their results;

      d.   disciplinary hearings; and

      e.   recordings of the call for service from the Store attendant.

17

65.     JPSO responded in writing on May 26, 2021. JPSO refused to release the video and service call recordings because of "pending criminal litigation." JPSO also rejected the release of the police report "due to a juvenile being involved," even though the request was being made by counsel for said "juvenile." Finally, JPSO rejected the release of internal affairs complaints and disciplinary hearings under privacy grounds. In sum, JSPO failed to provide any footage, internal reports, witness reports, disciplinarian records, or service calls, among the other requested items.

66.     On August 10, 2021, counsel wrote again to JPSO, noting that there was no pending criminal litigation against either A.B. or T.B., and renewed certain records requests. Specifically, counsel requested:

   a.  "Any body, backseat, and dash-camera recordings or footage from on or around December 14, 2020, related to" to the boys; and

   b.  "Any recording(s) of the call for service that Jefferson Parish Sheriff's Office received and responded to on or around December 14, 2020, related to" the boys.

67.     Rather than respond in writing to the August 10 letter as required under Louisiana Law, JPSO telephoned counsel to say that no records would be released until counsel had successfully filed a motion for disclosure in juvenile court under La. Child. Code art. 412 (2017).

68.     Counsel responded to that phone call with another letter on September 15, 2021, which detailed why JPSO's continued withholding of the records was unlawful. First, Counsel explained that no "juvenile" privacy interests are implicated by counsel attempting to obtain records on behalf of, and with consent of, the "juveniles." Second, Counsel explained that the cited privacy law, La. Child. Code art. 412, pertains to *court* records, not public records of the recordings Counsel requested. Finally, Counsel also explained that JSPO was required to provide written notice, not telephone notice, of its determination and reasoning for denying the record request.

69.     Defendant Blanchard, on behalf of JSPO, responded to the two-page detailed September 15 letter in two sentences on September 23, 2021. Abandoning the pretext of the

18

juvenile privacy interests, JPSO simply rejected the request because of "an ongoing investigation and pending criminal litigation." These statements were false, however, because the (1) investigation against A.B. and T.B. had concluded and there was no pending criminal litigation at that time; and (2) there was no investigation into or criminal charge against Defendant Kahrs or any other officer involved.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Unreasonable Seizure and/or False Arrest in Violation of the Fourth Amendment
### (Against Defendant Kahrs)

70.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

71.     Defendant, at all relevant times, was acting under the color of state law in his capacity as a Deputy of JPSO, and his acts or omissions were conducted within the scope of his official duties or employment.

72.     At 11:53 a.m. on December 14, 2020, Defendant Kahrs received a report about two juveniles (A.B. and T.B.) selling items in front of the Store. He arrived at the store minutes later, at approximately noon. When Defendant Kahrs arrived, the juveniles were no longer in the parking lot—indeed, they had first moved to the sidewalk before selling the last brownie and then proceeding north across Veterans Memorial Boulevard. After leaving the Store within a few minutes of arriving, Defendant Kahrs located and proceeded to follow the juveniles, before stopping A.B. at gunpoint, all within ten minutes of his arrival at the Store. Defendant Kahrs' gun and verbal commands directed at A.B. made it clear to any reasonable person that A.B. was not free to leave.

73.     It is clearly established law that if an officer exercises too much authority, too soon, a seizure is unconstitutional. That's what happened here. Defendant Kahrs stopped and unreasonably seized A.B. nearly immediately without attempting to ask him any questions. But Defendant Kahrs never had probable cause to seize or arrest A.B., because he did not observe A.B. committing any crime. By the time Defendant Kahrs arrived, A.B. had already left the Store premises he was allegedly trespassing on only minutes earlier. Put differently: because A.B. left the Store premises in a timely fashion—first to the sidewalk, then north across the street—he did not trespass. There were no other reports that A.B. had committed or was about to commit any crime. The lack of probable cause to arrest A.B. should have been evident to any reasonable person based on the facts and circumstances within Defendant Kahrs' knowledge at the time.

74.     Defendant Kahrs' conduct was objectively unreasonable in light of clearly established law providing that individuals have a right to be free from unreasonable searches, seizures, and false arrests.

75.     Defendant is not entitled to qualified immunity for the complained-of conduct because this conduct was objectively unreasonable and violated A.B.'s clearly established constitutional rights.

76.     Defendant Kahrs' conduct deprived A.B. of the rights, privileges, and immunities afforded to him under the Constitution and laws of the United States, including those under the Fourth and Fourteenth Amendments to the Constitution.

77.     As a direct and proximate consequence of Defendant's acts and omissions, including the unlawful seizure, A.B. has suffered and continues to suffer damages, including both physical and emotional injuries.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment
### (Against Defendant Kahrs)

78.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

79.    Defendant, at all relevant times, was acting with deliberate indifference and under the color of state law in his capacity as a Deputy of JPSO, and his acts or omissions were conducted within the scope of his official duties or employment.

80.    With no legal cause, Defendant Kahrs used repeated excessive force against A.B. Among other things, Defendant Kahrs subjected A.B. to at least twelve instances of excessive force. In addition to the reasons listed below, the force was excessive because (1) Defendant Kahrs knew the nature of any purported trespass was a minor, and not violent, crime; (2) Defendant Kahrs knew that A.B. was a juvenile; (3) Defendant Kahrs had received no report that either of the brownie-selling teens were armed, let alone violent; (4) Defendant Kahrs never saw a weapon; and (5) neither teen ever posed any threat—let alone a serious threat—of harm to Defendant Kahrs or any third party.

81.    The first instance of excessive force occurred when Defendant Kahrs stopped A.B. at gunpoint with no prior verbal warning. This use of force was unreasonable for the reasons listed above and because Defendant Kahrs never provided an opportunity for A.B. to comply with any "stop" command unaccompanied by the threat of lethal force. It is clearly established law that law enforcement cannot brandish a deadly weapon against a suspect who is not resisting arrest or posing a threat.

82.    The second instance of excessive force occurred when Defendant Kahrs violently shoved A.B. onto the hood of his police car. This use of force was unreasonable for the reasons listed above and because A.B. was already complying with Defendant Kahrs' demands. It is clearly

established law that law enforcement cannot use violent force against an individual who is not resisting and has signaled surrender.

83.     The third through seventh instances of excessive force occurred when Defendant Kahrs violently punched A.B. in the face at least five times, even though A.B. continued to comply with Defendant Kahrs' commands. Each of these uses of force was unreasonable for the reasons listed above and because A.B. was already complying with Defendant Kahrs' demands. It is clearly established law that law enforcement cannot use violent force against an individual who is not resisting and has surrendered.

84.     The eighth instance of excessive force is when Defendant Kahrs threw A.B. on the ground, even though he continued to comply with Defendant Kahrs' commands. This use of force was unreasonable for the reasons listed above and because A.B. was already complying with Defendant Kahrs' demands. It is clearly established law that law enforcement cannot use violent force against an individual who is not resisting and has surrendered.

85.     The ninth through eleventh instances of excessive force are when Defendant Kahrs continued to punch A.B. at least three times while he was on the ground. These uses of force were unreasonable for the reasons listed above and because A.B. was already complying with Defendant Kahrs' demands. It is clearly established law that law enforcement cannot use violent force against an individual who is not resisting and has surrendered.

86.     The twelfth instance of excessive force is when Defendant Kahrs climbed on top of A.B., who was lying face down on the ground, and briefly choked A.B. with his weight, even though A.B. continued to comply with Defendant Kahrs' commands This use of force was unreasonable for the reasons listed above and because A.B. was already complying with Defendant

Kahrs' demands. It is clearly established law that law enforcement cannot use violent force against an individual who is not resisting and has surrendered.

87.     Defendant Kahrs' conduct was objectively unreasonable in light of clearly established law providing that individuals have a right to be free from excessive force.

88.     Defendant is not entitled to qualified immunity for the complained-of conduct because this conduct was objectively unreasonable and violated A.B.'s clearly established constitutional rights.

89.     Defendant Kahrs' conduct deprived A.B. of the rights, privileges, and immunities afforded to him under the Constitution and laws of the United States, including those under the Fourth and Fourteenth Amendments to the Constitution.

### THIRD CAUSE OF ACTION
**Assault**
**(Against Defendant Kahrs)**

90.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

91.     Defendant's various actions immediately preceding his physical assault of A.B.— including, but not limited to, immediately aiming a gun at A.B—constituted threats to cause A.B. injury.

92.     Defendant intended to threaten to cause physical injury to A.B., and did in fact cause physical injury to A.B.

93.     Defendant's threat of physical injury to Plaintiff was unreasonable, and was not justified in light of the circumstances.

94.     Punitive damages should be awarded because Defendant's actions were excessive, extreme and outrageous, and he acted maliciously and with specific intent to oppress and harm A.B.

95.    As a direct and proximate result of the intentional conduct of Defendant, A.B. suffered and continues to suffer physical and psychological injury. These injuries were caused wholly by the intentional acts of Defendant.

### FOURTH CAUSE OF ACTION
**Battery**
**(Against Defendant Kahrs)**

96.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

97.    Defendant intended to use force to cause physical injury to A.B., and did in fact use force to cause injury to A.B.

98.    Defendant's use of force to cause physical injury to A.B. was unreasonable, was not justified in light of the circumstances, and was excessive.

99.    Punitive damages should be awarded because Defendant's actions were extreme and outrageous, and he acted maliciously and with specific intent to oppress and harm Plaintiff.

100.    As a direct and proximate result of the intentional conduct of Defendant, Plaintiff suffered and continues to suffer physical and psychological injury. These injuries were caused wholly by the intentional acts of Defendant.

### FIFTH CAUSE OF ACTION
**42 U.S.C. § 1983 –** *Monell* **Liability for Failure to Supervise, Investigate, and Decertify**
**(Against Defendant Lopinto)**

101.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

102.     Plaintiff asserts that Defendant Lopinto violated Louisiana law because of his negligence in supervising Defendant Kahrs.

103.    Defendant Lopinto was, at all relevant times, employed by the JSPO.

104.    Defendant Lopinto was responsible for supervising, investigating, and decertifying[28] JSPO officers, including Defendant Kahrs.

105.    Defendant Lopinto failed to investigate Defendant Kahrs' conduct. Ms. Brooks filed a complaint days after the incident, but never received any follow-up or results; nor was she able to obtain any records about the investigation from records requests she submitted. On information and belief, Defendant Lopinto was aware, or should have been aware, due to Ms. Brook's complaint, that Defendant Kahrs engaged in police misconduct when he used excessive force to arrest A.B. But Defendant Lopinto failed to investigate Defendant Kahrs for this conduct. This is because—consistent with JPSO's policy to not keep use-of-force records and complaints for excessive force—on information and belief, JPSO simply does not investigate use-of-force claims. Indeed, Louisiana has not decertified a single officer for misconduct in the past decade and local police departments because JPSO, and other police departments, do not seek decertification of officers.

106.    In addition, Defendant Lopinto's failure to investigate this and prior excessive force cases is part of his failure to implement proper policies and procedures regarding the use of excessive force and racial profiling. Based on the prior cases, statistics, and news reports cited above at paragraphs 3 and 16–26, there are stark racial disparities in the treatment of minorities, specifically Black men, by JSPO, which can only be explained by conscious policy or deliberate indifference. And the JSPO hides these discrepancies by failing to track excessive force cases or making records available pursuant to lawful public records requests.

---

[28] Decertifying refers to the process by which a police department requests that the state decertify an officer of his or her state law enforcement certification to prevent the officer from being hired at other police stations.

107.    As a direct and proximate cause of Defendant Lopinto's failure to investigate Defendant Kahr and promptly investigate, punish, and fire him, including through the failure to implement proper policies and procedures which would address this misconduct, A.B. suffered injury and maintains a persistent fear of JPSO.

108.    Defendant Lopinto's failure to supervise, investigate, and decertify officers amounts to deliberate indifference, because he was or reasonably should have been aware that this failure would result in a constitutional violation.

109.    As a direct and proximate cause of Defendant Lopinto's failures, A.B. has suffered damages.

### SIXTH CAUSE OF ACTION
**Respondeat Superior**
**(Against Defendant Lopinto)**

110.    Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

111.    Plaintiff asserts that Defendant Lopinto violated Louisiana law because of his negligence in supervising Defendant Kahrs.

112.    Defendant Lopinto was, at all relevant times, employed by the JSPO.

113.    Defendant Lopinto was responsible for supervising, investigating, and decertifying JSPO officers, including Defendant Kahrs.

114.    As his superior, Defendant Lopinto is responsible for Defendant Kahrs' misconduct in the course of his employment, including his use of excessive force.

115.    In addition, Defendant Lopinto failed to investigate Defendant Kahrs' conduct. Ms. Brooks filed a complaint days after the incident, but never received any follow-up or results; nor was she able to obtain any records about the investigation from records requests she submitted. On information and belief, Defendant Lopinto was aware, or should have been aware, due to Ms.

26

Brook's complaint, that Defendant Kahrs engaged in police misconduct when he used excessive force to arrest A.B. But Defendant Lopinto failed to investigate Defendant Kahrs for this conduct. This is because—consistent with JPSO's policy to not keep use-of-force records and complaints for excessive force—on information and belief, JPSO simply does not investigate use-of-force claims. Indeed, Louisiana has not decertified a single officer for misconduct in the past decade and local police departments because JPSO, and other police departments, do not seek decertification of officers.

116.   As a direct and proximate cause of Defendant Lopinto's failure to investigate Defendant Kahr and promptly investigate, punish, and fire him, A.B. suffered injury and maintains a persistent fear of JPSO.

117.   Defendant Lopinto's failure to supervise, investigate, and decertify officers amounts to deliberate indifference, because he was or reasonably should have been aware that this failure would result in a constitutional violation.

118.   In addition, Defendant Lopinto's failure to investigate this and prior excessive force cases is part of his failure to implement proper policies and procedures regarding the use of excessive force and racial profiling. Based on the prior cases, statistics, and news reports cited above at paragraphs 3, and 16–26, there are stark racial disparities in the treatment of minorities, specifically Black men, by JSPO, which can only be explained by conscious policy or deliberate indifference. And the JSPO hides these discrepancies by failing to track excessive force cases or making records available pursuant to lawful public records requests.

119.   As a direct and proximate cause of Defendant Lopinto's failure to investigate Defendant Kahr and promptly investigate, punish, and fire him, including through the failure to

implement proper policies and procedures which would address this misconduct, A.B. suffered

injury and maintains a persistent fear of JPSO.

120.    Defendant Lopinto's failure to supervise, investigate, and decertify officers

amounts to deliberate indifference, because he was or reasonably should have been aware that this

failure would result in a constitutional violation.

**SEVENTH CAUSE OF ACTION**
**Violation of Louisiana Public Records Law**
**(Against Defendant Blanchard)**

121.    Plaintiff hereby incorporates by reference all preceding paragraphs of this

Complaint as if fully set forth herein.

122.    Each person's right to examine public documents is preserved by Article XII, § 3

of the Louisiana Constitution and the Public Records Law, La. Stat. § 44:31, et seq. In connection

with A.B.'s arrest, Plaintiff, through undersigned counsel, sought the previously listed public

records from the records custodians of JSPO, Defendant Blanchard, under Louisiana's Public

Records Law.

123.    To date, the previously mentioned public records have not been received.

124.    Further, Defendant Blanchard did not produce the requested records within five

days of receipt of Plaintiff's requests to access the public records, nor did the custodian provide

Plaintiff's counsel a written estimate of the time reasonably necessary for collection, redaction,

examination, or review of the request. The custodian has: (i) unreasonably delayed producing the

requested records, (ii) arbitrarily and capriciously withheld the requested records, and (iii)

unreasonably and arbitrarily failed to respond to the request as required by Louisiana R.S. 44:3.

125.    Accordingly, Plaintiff has been deprived of his rights under the Louisiana Public

Records Law and are entitled to injunctive relief and/or issuance of a writ of mandamus, attorneys'

fees and costs, and damages, including the attorneys' fees incurred for bringing this action should

the withheld records plainly contradict any of Plaintiffs' claims.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment as follows:

      i.   A declaration that the Defendant Kahrs' conduct violates the Fourth and

          Fourteenth Amendments of the United States Constitution;

     ii.   Compensatory damages;

   iii.   Punitive damages;

   iv.   Reasonable attorney's fees and costs;

    v.   Injunctive relief to prevent future harm or loss of property; and

   vi.   All other such relief as the Court deems necessary, just, and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims.

Dated: December 10, 2021

*/s/Dewayne L. Williams*
William D. Aaron, Jr. (#2267)
Dewayne L. Williams (#27685)
Anna A. Rainer (#31531)
AARON & GIANNA, PLC
201 St. Charles Avenue, Suite 3800
New Orleans, LA, 70170
Telephone (504) 569-1800
Facsimile: (504) 569-1801
Email: waaron@aarongianna.com
dwilliams@aarongianna.com
arainer@aarongianna.com

*and*

Nathan A. Holcomb (pro hac vice forthcoming)
Jordana Haviv (pro hac vice forthcoming)
Richard R. Cipolla (pro hac vice forthcoming)
ROCHE FREEDMAN LLP
99 Park Street, Suite 1910
New York, New York 10016
Telephone: (646) 791 6881

*and*

Nora Ahmed (*pro hac vice*)
Nahmed@laaclu.org
ACLU Foundation of Louisiana
1340 Poydras Street, Suite 2160
New Orleans, LA 70112
Telephone: (504) 522-0628

*Attorneys for Plaintiff*
*Shavonda Brooks on behalf*
*of minor child A.B.*

30